**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 29, 2024

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 29, 2024

*Sarah Pendleton*
SARAH R. PENDLETON
ACTING SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of: | No. 102355-3 |
| CLIFFORD A. PORTER, | En Banc |
| Petitioner, | |
| and | Filed: August 29, 2024 |
| PEGGY A. PORTER, | |
| Respondent. | |

WHITENER, J. — This case involves a matter of first impression. Clifford Porter and Peggy Huckstadt (formerly known as Porter) were married from 1977 to 1994 and, during the entire marriage, Porter served in the military. In the dissolution decree, the trial court awarded Huckstadt a fractional share of Porter's military retirement and entered a "Military Qualifying Court Order" (MQCO) assigning Huckstadt a 30.25 percent interest in Porter's disposable military retired pay. In 2002, Porter retired from the military and worked in private practice as a surgeon.

In 2009, the military involuntarily recalled Porter to active duty to serve in Afghanistan. Porter returned to the military and during the next three years of involuntary recalled active duty service, Porter was promoted from lieutenant

colonel to colonel and received a corresponding salary increase, which increased his monthly retirement pay. In 2012, Porter retired again from active duty service.

In 2022, Porter filed a motion to clarify the dissolution decree and MQCO, arguing that Huckstadt's share of his military retirement should be based on his rank and salary at the time of his first retirement in 2002, not his second retirement from involuntary recalled active duty service in 2012. The trial court disagreed and concluded that the increases in Porter's military pension earned due to his involuntary recall service counted as community property subject to division with Huckstadt. In a partially published opinion, the Court of Appeals affirmed reasoning that Porter's rank and salary increases during the recall period were based on 17 years of "community efforts." *In re Marriage of Porter*, 27 Wn. App. 2d 702, 713, 533 P.3d 465 (2023).

Porter appeals the Court of Appeals' decision and presents two issues for this court's review. The first issue is whether Porter's increased pension payments earned from the time he served on involuntary recall to active duty after the divorce constitutes community property to which Huckstadt is entitled a share. The second issue is whether federal law preempts state courts from including retirement benefits earned during a former spouse's involuntary military recall period into the parties' community property.

We hold that Porter's rank and salary at his second retirement cannot be used to calculate the community portion of the military pension because the "community efforts doctrine," on which the Court of Appeals relied, does not apply under these specific circumstances. Based on this holding, we decline to reach the issue of federal preemption. Accordingly, we reverse the Court of Appeals and remand to the trial court for further proceedings.

FACTS

I.     BACKGROUND ON RECALL TO ACTIVE DUTY SERVICE AND MILITARY RETIRED PAY

"The Federal Government has long provided retirement pay to those veterans who have retired from the Armed Forces after serving, *e.g.*, 20 years or more." *Howell v. Howell*, 581 U.S. 214, 216, 137 S. Ct. 1400, 197 L. Ed. 2d 781 (2017); 10 U.S.C. §§ 7311 (army officers). "[M]ilitary retired pay differs in some significant respects from a typical pension or retirement plan." *McCarty v. McCarty*, 453 U.S. 210, 221, 101 S. Ct. 2728, 69 L. Ed. 2d 589 (1981). One significant difference, relevant here, is that retired members of the armed forces remain subject to recall to active duty by the secretary of the military department concerned "at any time." 10 U.S.C. § 688(a), (b); *McCarty*, 453 U.S. at 222 (discussing Pub. L. No. 96-513, § 106, 94 Stat. 2868).

Recall to active duty service can be either voluntary or involuntary. *See, e.g.*, 10 U.S.C. §§ 688 (involuntary recall), 688a (voluntary recall). For voluntary recalls, the secretary of a military department has the authority to order a retired member to active duty for the purposes of alleviating a "high-demand, low-density military capability or in any other specialty," so long as the member consents. 10 U.S.C. § 688a(a). These recalls last for a duration that is specified in the agreement between the secretary and the member, and only 1000 members in total may be on active duty under such an agreement at any time. 10 U.S.C. § 688a(b)-(c). However, the latter limitation does not apply during a time of war or of national emergency declared by Congress or the president. 10 U.S.C. § 688a(f).

For involuntary recalls, the secretary of a military department has the authority to order a retired member to perform "such duties as the Secretary considers necessary in the interests of national defense" without the member's consent. 10 U.S.C. § 688(c). Under this scenario, service time is limited to an aggregate of 12 months within the 24 months following the first day of active duty status. 10 U.S.C. § 688(e)(1). However, this limitation period does not apply to certain officers such as health care professionals or during times of war or national emergency declared by Congress or the president. 10 U.S.C. § 688 (e)(2), (f).

Recall into active duty service is neither the norm nor a foreseeable event. According to one commentator, "[e]ven in a national emergency, a tiny percentage

of retired service members would be realistically subject to involuntary recall." Steve Vladeck, *The Supreme Court and Military Jurisdiction Over Retired Servicemembers*, LAWFARE (Feb. 12, 2019, 7:00 AM), https://www.lawfareblog.com/supreme-court-and-military-jurisdiction-over-retired-servicemembers [https://perma.cc/K8W9-KNP5]. Another commentator explained that "[r]etirees have not been recalled into active duty service because of the readily available pool from each [military] branch's respective reserve component." Pavan S. Krishnamurthy & Javier Perez, *Contemptuous Speech: Rethinking the Balance Between Good Order and Discipline and the Free Speech Rights of Retired Military Officers*, 12 HARV. NAT'L SEC. J. 288, 317 (2021).

As to determining military retired pay, "[t]he amount of retirement pay a veteran is eligible to receive is calculated according to the number of years served and the rank achieved." *Mansell v. Mansell*, 490 U.S. 581, 583, 109 S. Ct. 2023, 104 L. Ed. 2d 675 (1989). More specifically, a veteran's "monthly retired pay" is determined by multiplying their "retired pay base" by their "retired pay multiplier." 10 U.S.C. § 7361(a)(1) (army). The United States Department of Defense Finance and Accounting Service (DFAS) commonly refers to the "retired pay multiplier" as the "service percent multiplier."

If, as in this case, a veteran entered active or reserve military service before September 8, 1980, the "retired pay base" will be based on their final basic monthly

pay on the date of retirement. 10 U.S.C. § 1406(a), (c)(1)-(2). The "service percent multiplier" is determined by multiplying 2½ by the veteran's years of creditable service. *See* 10 U.S.C. § 1409(b)(1). According to DFAS, "[e]ach year of active duty service is worth 2.5 percent toward your service percent multiplier," so "[a] retiree with 20 years of service would have a service percent multiplier of 50 percent." [1] The "service percent multiplier" is capped at 75 percent, which equates to 30 years or more of creditable service. *See* 10 U.S.C. § 1409(b)(3).

## II.   FACTUAL BACKGROUND

In 1976, Porter joined the United States Army and married Huckstadt the following year. Clerk's Papers (CP) at 205. Porter served in the military for the entirety of the marriage, including while he attended medical school for four years. CP at 24, 99, 205. In November 1994, Porter and Huckstadt divorced after 17 years of marriage. CP at 205.

The dissolution decree provided that Huckstadt was entitled to a fractional share of Porter's military retirement pay. CP at 24-25. The trial court provided two alternative formulas to determine that share. CP at 24-25. The first alternative applied if Porter did not receive credit toward his military retirement for his time in medical school. CP at 24. Under this first scenario, Huckstadt's share would be

---

[1] *See* https://www.dfas.mil/retiredmilitary/plan/estimate/.

determined by the following formula: ½ x (11 years/number of years of creditable military time toward retirement). CP at 24. The second alternative applied if Porter did receive such credit. CP at 24-25. Under this second scenario, Huckstadt's share would be determined by the following formula: ½ x (15 years/number of years of creditable military time toward retirement). CP at 24. The dissolution decree, however, did not specify what point in time the retirement benefits would be distributed by the court. CP at 24-25.

In 2002, eight years after the divorce, Porter retired from the army at the rank of lieutenant colonel and entered private practice as a surgeon. CP at 98. In 2003, the trial court entered an MQCO, which assigned Huckstadt a 30.25 percent interest in Porter's disposable military retired pay. CP at 33. This equaled half of the community portion of the military retirement as required by the dissolution decree. CP at 98.

In 2009, 15 years after the divorce, and 7 years after entering private practice, the army involuntarily recalled Porter to active duty to serve in Afghanistan. CP at 98, 164. He served for an additional three years, during which time he was promoted to the rank of colonel. CP at 98. During Porter's recall to military service, the military stopped issuing retirement payments to Porter and Huckstadt. CP at 100, 164.

In 2012, Porter retired for a second time upon completion of his required recalled service time. CP at 100. At that time, the DFAS reinstated monthly retirement payments to Huckstadt at 30.25 percent of Porter's total monthly retirement benefit, which had "significantly increased" due to his additional years of service and rank promotion. CP at 100-01.

III. PROCEDURAL HISTORY

In February 2022, Porter filed a motion to clarify the dissolution decree and the 2003 MQCO, arguing that Huckstadt's portion of the pension should not include the salary increases resulting from his involuntary recall to active duty service. CP at 85-93. In the alternative, he asked the trial court to vacate or modify the MQCO and issue a military retired pay division order directing correct payments equaling one-half of the community portion of the military retired pay to Huckstadt. CP at 95-96.

After a hearing on Porter's motion, the trial court concluded that Porter's retired pay and rank at his second retirement should be used to calculate Huckstadt's share of the military pension. CP at 207-09. The court reasoned that as a matter of law, the intent of the dissolution decree supported the ruling and that Porter's previous military service allowed him to be promoted to colonel. CP at 207-08. Accordingly, the court entered an order adding Porter's three additional years of service to the formula in determining Huckstadt's fractional share, which reduced

Huckstadt's share from 30.25 percent to 27.273 percent of the military retirement pay. CP at 208.

Porter appealed and the Court of Appeals affirmed, holding that "[Porter]'s salary increases received during the recall to military service were based on about 17 years of community efforts and the salary increases should be used in calculating [Huckstadt]'s share of the military retirement." *Porter*, 27 Wn. App. 2d at 713.

Porter now seeks this court's review, which we granted. Amicus curiae Veterans of Foreign Wars (VFW) submitted a brief in support of Porter, which we accepted.

ANALYSIS

PORTER'S RANK AND SALARY INCREASE EARNED DURING INVOLUNTARY RECALL INTO MILITARY SERVICE ARE NOT PRESUMABLY THE RESULT OF COMMUNITY EFFORTS

Porter argues that the Court of Appeals erred in holding that his rank and salary increase earned during involuntary recall should be used in calculating the community portion of his military pension because the "community efforts doctrine" does not apply under these specific circumstances. Appellant's Pet. for Rev. by Wash. State Sup. Ct. (Pet. for Rev.) at 1-2, 7-19. We agree.

A.    Standard of Review

Property valuation is a question of fact and is reviewed for substantial evidence.

However, "[w]here the relevant facts are undisputed and the parties dispute only the legal effect of those facts, the standard of review is . . . de novo." *Meadow Valley Owners Ass'n v. Meadow Valley, LLC*, 137 Wn. App. 810, 816, 156 P.3d 240 (2007).

On the other hand, "[a] trial court's characterization of property is a mixed question of law and fact." *In re Marriage of Watanabe*, 199 Wn.2d 342, 348, 506 P.3d 630 (2022). Like valuation determinations, "[f]actual findings … supporting the characterization are reviewed for substantial evidence." *Id*. "The characterization of property is reviewed de novo as a question of law." *Id*. at 348-49.

B.    Legal Principles

This case is not only about the characterization of property during a dissolution but also about the valuation of the property. All property, both separate and community, is before the court for a just and equitable distribution. *In re Marriage of Brewer*, 137 Wn.2d 756, 766, 976 P.2d 102 (1999). "Characterization of property as community or separate is not controlling in [a] division of property between the parties in a dissolution proceeding, but 'the court must have in mind the correct character and status of the property ... before any theory of division is ordered.'" *Id*. (footnote omitted) (quoting *Blood v. Blood*, 69 Wn.2d 680, 682, 419 P.2d 1006 (1966)).

"Washington courts abide by the general principle that increases in retirement benefits occurring after separation should not be treated as separate property if the increase was enhanced by community efforts over many years."[2] *In re Marriage of Hurd*, 69 Wn. App. 38, 46, 848 P.2d 185 (1993), *abrogated on other grounds by In re Est. of Borghi*, 167 Wn.2d 480, 219 P.3d 932 (2009); *see also In re Marriage of Chavez*, 80 Wn. App. 432, 437-38, 909 P.2d 314 (1996); *In re Marriage of Bulicek*, 59 Wn. App. 630, 638-39, 800 P.2d 394 (1990). Porter refers to this general principle as the "community efforts doctrine."

"Pension benefits are deferred income. As such, pension benefits which accrue during a term of employment are characterized in the same way as the income earned during that term of employment." *In re Marriage of Landry*, 103 Wn.2d 807, 810, 699 P.2d 214 (1985). Under RCW 26.16.140, "[w]hen spouses or domestic partners are *living separate and apart*, their respective earnings and accumulations *shall* be the separate property of each." (Emphasis added.) This statute applies when there is a permanent separation or a "'defunct' marriage,"—that is, a lack of will by both parties to continue the marital relationship. *In re Marriage of Short*, 125 Wn.2d

---

[2] Porter cites *In re Marriage of Pea*, 17 Wn. App. 728, 731-32, 566 P.2d 212 (1977), as the progenitor of the community efforts doctrine. However, this case says nothing about whether increases in retirement benefits earned after separation are presumed to be community property. Rather, it simply held that the wife was entitled to the community portion of the husband's monthly military retired pay, but not salary increases due to the husband's service credits earned beyond 20 years, without any further reasoning. *Id*. Therefore, *Pea* is not further discussed.

865, 871, 890 P.2d 12 (1995) (quoting *Aetna Life Ins. Co. v. Bunt*, 110 Wn.2d 368, 372, 754 P.2d 993 (1988)). On the other hand, earnings and accumulations acquired during marriage are presumed to be community property. *See id.* at 870. Community property is also defined as "all other property acquired by either spouse after marriage that is not separate property." *Id.* at 871 (discussing RCW 26.16.030).

"[I]t is settled in this jurisdiction that a military pension is community property to the extent that community funds have been invested in it and that it is before the court for consideration in a dissolution proceeding." *Wilder v. Wilder*, 85 Wn.2d 364, 367, 534 P.2d 1355 (1975) (discussing RCW 26.09.080). "If the pension was accumulated partly prior to marriage and partly after marriage, it is proportionately classified, with the portion acquired during marriage characterized as community property." *In re Marriage of Rockwell*, 141 Wn. App. 235, 251, 170 P.3d 572 (2007) (citing *Landry*, 103 Wn.2d at 810). "Generally, the community share is calculated by dividing the number of years of marriage (prior to separation) by the total number of years of service for which pension rights were earned and multiplying the results by the monthly benefit *at retirement*." *Id.* at 251-52 (emphasis added). "This is known as the 'time rule method.'" *Id.* at 252.

Notably, by calculating the community portion of a pension based on the total number of years of service and the monthly benefit at retirement, the "time rule"

12

method includes retirement benefits earned in the years following permanent separation, which appears to conflict with RCW 26.16.140.

*Bulicek*, a 1990 case, is the first decision from our state that explicitly discussed the rationale behind the community efforts doctrine. There, the parties were married for 22 years prior to separation, and the husband worked for the same company during their entire marriage where he accrued a pension. *Bulicek*, 59 Wn. App. at 631-32. The husband became eligible for early retirement 4 years after the parties had separated, but he opted not to retire. *Id*. at 632. In the dissolution, the trial court granted the wife a percentage, as-received amount of the husband's monthly pension. *Id*. Under this method, the wife's monthly payout could increase after dissolution due to the husband's prospective pay increases. *Id*. at 636. The husband appealed, arguing that this formula adopted by the trial court improperly allowed the wife to share in postseparation contributions to his pension, which are his separate property. *Id*. Instead, he contended that the trial court should have given a value to the retirement benefits and apportioned them at the time of trial. *Id*.

The Court of Appeals disagreed, holding that the trial court did not abuse its discretion in awarding the wife a percentage of the pension on an as-received basis. *Id*. at 639. The court reasoned that the parties were married for 22 years and the husband's advancements and pay raises "during that time came as *a direct result of community effort and performance*." *Id*. at 638 (emphasis added). Then, relying on

13

*In re Marriage of Adams*, 64 Cal. App. 3d 181, 134 Cal. Rptr. 298 (1976), the court went on to presume that "the prospective increase[s] in retirement benefits due to increased pay after separation is founded on those 22 years of community effort." *Bulicek*, 59 Wn. App. at 638. In *Adams*, the California court of appeal for the second district announced the following principle:

> When the employed spouse continues working after separation, *in many cases* the increased retirement benefits will be attributable in part to such spouse's continued earnings, and in part to the previous community property contributions. For the reasons stated below, the nonemployee spouse should be entitled to a valuation of the community interest at the later date if he or she so desires.

64 Cal. App. 3d. at 186 (emphasis added). Thus, the court in *Bulicek* affirmed the formula utilized by the trial court "as a means of recognizing the community contribution to such [prospective pay] increases." 59 Wn. App. at 639.

Three years later, in *Hurd*, the Court of Appeals dealt with the distribution of a pension governed by the Law Enforcement Officers and Firefighters plan in a 16 year marriage. 69 Wn. App. at 42-44. There, the husband became eligible for retirement by the date the parties separated; however, shortly after separation, the husband's salary increased significantly. *Id*. at 43. The trial court valued the community share of the pension based on the husband's salary prior to separation. *Id*. at 44-45. The Court of Appeals reversed, holding that the trial court should have considered "Mr. Hurd's higher salary figure in calculating the community share of

14

the present value of his monthly pension." *Id*. at 46. Relying on *Bulicek*, the court reasoned that "[a]lthough a spouse's earnings following separation are generally characterized as separate property, Mr. Hurd's salary increase, *received shortly after separation, should be presumed to be the result of community efforts* absent substantial evidence to the contrary. We find no such contrary evidence here." *Id*. (footnote omitted) (emphasis added).

In 1996, the Court of Appeals in *Chavez* dealt with the distribution of a military pension following a 21 year marriage. 80 Wn. App. at 434. There, the parties' marriage was dissolved in 1986 and the husband retired from the army in 1993, 7 years later. *Id*. at 434-35. Due to his 30 years of service, he was entitled to a pension of 75 percent of his base salary. *Id*. at 435. The husband challenged the dissolution decree, which had awarded the wife 50 percent of this pension, arguing that his salary at retirement should not be used to calculate the wife's share of the pension because that salary was different from his salary at the time of divorce. *Id*. at 437. The Court of Appeals disagreed, holding that the wife's share of the pension should be based on the husband's salary at the time of his retirement, not at the time of divorce. *Id*. at 437-38. Citing *Bulicek* and *Hurd*, the court reasoned that the increases in pension benefits based on the husband's increased salary were presumably made possible by community efforts. *Id*. However, the court was

careful to note that the wife's share of the pension should not be increased due to the additional "service credits" that the husband earned subsequent to the divorce. *Id*.

In summary, the cases discussed above stand for the proposition that courts will presume, following a lengthy marriage, that increased monthly retirement benefits that were earned *shortly after separation are a direct result of community effort and performance*. This presumption can be rebutted with substantial evidence showing that the increased monthly retirement benefits earned after separation falls within the ambit of RCW 26.16.140. However, none of the cases discussed above stand for the proposition that this presumption lasts indefinitely or the that "time rule" method can be based on the monthly benefit amount following a *second* retirement, which brings us to this case.

> C. The "Time Rule" Method Should Not Be Employed Inflexibly and the "Community Efforts Doctrine" Does Not Apply under the Facts of This Case

Porter argues that the Court of Appeals erred in holding that his salary increases earned during the recall period are included in calculating the community portion of his military retirement. Pet. for Rev. at 7. He reasons that the community efforts doctrine does not apply here because, unlike *Bulicek* and its progeny, his increased salary was not earned shortly after separation. *See id.* at 13-14; Suppl. Br. of Pet'r/Appellant at 6. We agree.

In *Wilder*, a case dealing with the distribution of a military pension, this court stated that Washington takes a "flexible and … realistic approach to the question of equitable distribution of pension benefits between divorced spouses." 85 Wn.2d at 368. Indeed, since not all dissolutions are factually the same, "[t]here can be no set rule for determining every case and[,] as in all other cases of property distribution, the trial court must exercise a wise and sound discretion." *Id*. at 369. Thus, courts should exercise caution in applying the community efforts doctrine by paying particular attention to the facts and circumstances of each case.

*Spencer v. Spencer* is particularly instructive about how to value Porter's postdivorce salary increases because the facts of that case are strikingly similar to the facts of this case. 197 Vt. 1, 100 A.3d 334 (2014). There, the parties married in 1981 while the husband served in the army, and he retired in 1998, after almost 22 years of service. *Id*. at 2. In 2000, 2 years after his retirement, the parties divorced and the decree awarded the wife 41.8 percent of the military pension. *Id*. However, in 2009, 11 years after the husband's retirement and 9 years after the parties' divorce, the husband was recalled to serve as a military instructor in the ROTC program at the University of New Hampshire. *Id*. He was discharged in 2012, and, due to his additional 3 years of service, he received an increase in his monthly pension benefit. *Id*. The husband filed a motion to amend the decree, arguing that the wife's payment

should be calculated based on his completed service at the time of the divorce, not at his second retirement. *Id*. at 2-3.

The trial court denied the motion, and the Supreme Court of Vermont reversed and remanded for an additional hearing as to whether the decree should be reformed to conform to the parties' expectations. *Id*. at 3-6. The court reasoned that the case before it was not a "typical divorce situation involving the division of a spouse's pension who was *still* employed at the time of the divorce." *Id*. at 5. The court opined that normally in such cases, since the pension's ultimate value is still unknown at the time of divorce, the court may "infer an intent that the nonemployed spouse should benefit from the post-divorce employment because some of the power to produce the added value was acquired during the marriage." *Id*. In a way, this is quite similar to the community efforts doctrine that Washington has adopted. However, the court rejected a blind application of that presumption reasoning that "in these circumstances, where [the] husband has already retired and his pension is under distribution, pension benefits acquired due to unanticipated post-divorce service are more like property acquired strictly after the marriage, and therefore not subject to equitable distribution." *Id*. at 6.

Here, the Court of Appeals erred in applying the community efforts doctrine mechanically to the facts of this case. *Bulicek*, *Hurd*, and *Chavez* are distinguishable and not controlling because, unlike those "typical divorce" cases, the salary

increases to Porter's monthly pension benefit were not earned shortly after the parties separated, nor were they *a direct result of community effort and performance*. Rather, like *Spencer*, the increase in Porter's retired pay was earned following an involuntary recall occurring nearly 18 years after the divorce and 10 years after his first retirement in 2002, during which time he worked in the private sector. Thus, like *Spencer*, the retirement benefits earned during the recall period are more akin to earnings and accumulations acquired strictly after marriage and are not a direct result of community effort and performance. Additionally, none of the cases relied on by Huckstadt or the Court of Appeals purported to hold that the community efforts doctrine applies indefinitely so long as there is *some* marital foundation for it. In fact, to accept that notion would require judges to apply the rule inflexibly, which contradicts the command laid down by this court in *Wilder*. Furthermore, extending the doctrine to these facts would effectively render RCW 26.16.140 meaningless when applied to pensions, which, as explained above, states that earnings and accumulations of spouses while "living separate and apart" shall be considered separate property.

Therefore, we hold that the community efforts doctrine is inapplicable in this case. The increased pension benefits to Porter's military retirement were not the direct result of community effort and performance. Accordingly, Porter's rank and

salary at his second retirement cannot be used to calculate the community portion of the military pension.

> D.  Neither the Dissolution Decree nor the Parties Contemplated a Second Retirement

The Court of Appeals also held the trial court intended for Huckstadt to receive one-half of the community portion of the *total* military retired pay when issuing the dissolution decree, which included future salary increases stemming from involuntary recall. *Porter*, 27 Wn. App. 2d at 711-12. Porter does not assign error to this portion of the Court of Appeals' decision; however, it is addressed because, contrary to the Court of Appeals' holding, the dissolution decree actually intended to value the community share of the military pension based on Porter's monthly benefit following his first retirement.

The interpretation of a dissolution decree is a question of law that we review de novo. *In re Marriage of Thompson*, 97 Wn. App. 873, 877, 988 P.2d 499 (1999). Decrees are reviewed like a contract and therefore "should be construed as a whole, giving meaning and effect to each word." *Stokes v. Polley*, 145 Wn.2d 341, 346, 37 P.3d 1211 (2001). In doing so, "'[w]ords should be given their ordinary meaning.'" *Id*. at 347 (alteration in original) (quoting *Corbray v. Stevenson*, 98 Wn.2d 410, 415, 656 P.2d 473 (1982)).

"Where a judgment is ambiguous, a reviewing court seeks to ascertain the intention of the court entering the original decree by using general rules of construction applicable to statutes, contracts and other writings." *In re Marriage of Gimlett*, 95 Wn.2d 699, 704-05, 629 P.2d 450 (1981). "Normally the court is limited to examining the provisions of the decree to resolve issues concerning its intended effect." *Id.* at 705. "The goal of construing statutory language is to carry out the intent of the legislature; in doing so, we avoid strained, unlikely, or unrealistic interpretations." *First Student, Inc. v. Dep't of Revenue*, 194 Wn.2d 707, 711, 451 P.3d 1094 (2019). Similarly, in the context of contracts, "'[w]hen a provision is subject to two possible constructions, one of which would make the contract unreasonable and imprudent and the other of which would make it reasonable and just, we will adopt the latter interpretation.'" *Berg v. Hudesman*, 115 Wn.2d 657, 672, 801 P.2d 222 (1990) (quoting *Fisher Props., Inc. v. Arden–Mayfair, Inc.*, 106 Wn.2d 826, 837, 726 P.2d 8 (1986)).

Here, the dissolution decree is ambiguous because it failed to specify at what point in time the pension was to be distributed. *Chavez*, 80 Wn. App. at 435. Rather, it stated only that Huckstadt was entitled to a fractional share of Porter's military retirement, which could include his rank and salary at the time of his first retirement or second retirement following his involuntary recall. CP at 24-25. Thus, we must

21

turn to the general rules of construction applicable for writings to determine the decree's intended effect.

Initially, the parties agreed to determine the amount of retirement benefits owed at the time of the divorce. CP at 8. However, the parties and the court were unable to determine that amount at the divorce trial. Instead, the dissolution decree reserved that question for a future date because the parties were unsure about whether Porter would receive credit toward his military retirement for his time in medical school. CP at 24-25. Indeed, based on the formulas used by the trial court in the dissolution decree, it is reasonable to assume that the court and parties intended that the division of military retired pay would be determined following Porter's first retirement. *Id*. This is because, by that point, Porter would have learned whether he received credit for his time in medical school, which he did. CP at 28-30. Additionally, while involuntary recall is certainly a possibility for retired service members, it is unrealistic and unreasonable to believe that the court contemplated or the parties negotiated for that event, especially given the fact that even in a national emergency, only a tiny percentage of retired service members would be subject to involuntary recall.

Accordingly, we hold that the dissolution decree intended to value Huckstadt's community share of the military pension based on Porter's rank and salary following his first retirement and not his second retirement.

Porter and amicus argue by implication that federal preemption is applicable in this case. Pet. for Rev. at 19-23; Suppl. Br. of Pet'r/Appellant at 8-16, Amicus Curiae Br. of VFW at 5-10. However, "[w]e will not reach a constitutional issue 'unless absolutely necessary to the determination of the case.'" *In re Citizen Complaint by Stout*, 198 Wn.2d 180, 184, 493 P.3d 1170 (2021) (quoting *State v. Hall*, 95 Wn.2d 536, 539, 627 P.2d 101 (1981)). Therefore, we decline to reach Porter's constitutional arguments. We reverse and remand on nonconstitutional grounds.

CONCLUSION

We hold that the Court of Appeals erred in applying the community efforts doctrine under these circumstances. Porter's rank and salary at his second retirement cannot be used to calculate Huckstadt's community share of the military pension. Additionally, we also hold that the dissolution decree intended that Huckstadt's community share of the military pension would be determined based on the value of Porter's rank and salary following his first military retirement and not his second military retirement. We decline to reach the issue of federal preemption. Accordingly, we reverse the Court of Appeals and remand to the trial court for further proceedings.

_____
Whitener, J.

WE CONCUR.

_____ _____
González, C.J.         Stephens, J.

_____ _____
Johnson, J.         Gordon McCloud, J.

_____ _____
Madsen, J.         Yu, J.

_____ _____
Owens, J.         Montoya-Lewis, J.