IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DAOYING CAI and XIANGSONG HONG, husband and wife and the marital community composed thereof,<br><br>Respondents,<br><br>v.<br><br>YUAN WEN and JANE DOE WEN, husband and wife and the marital community composed thereof,<br><br>Appellants.<br><br>and<br><br>BOHENG WEN and SHU XIE, husband and wife and the marital community composed thereof, and ENDRONIC CORPORATION, a Washington corporation,<br><br>Defendants. | No. 88565-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — Daoying Cai and Xiangsong Hong (Cai) sued Boheng Wen and Shu Xie (Wen) following an investment dispute. Cai brought claims for conversion, breach of contract, constructive trust, fraudulent conveyance, unjust enrichment, Consumer Protection Act violations, and negligence. In June 2022, the parties entered into a settlement agreement in which Wen agreed to pay Cai $650,000. Because Wen did not have the funds, Wen's children agreed to sell their homes to fund the payment. Post-settlement and enforcement action went

on for years, including the entry of two judgments against Wen and two orders granting Cai's motions to enforce the settlement agreement. In 2025, Wen moved for enforcement of the settlement agreement, alleging Cai breached the agreement. The court denied Wen's motion. Wen moved for reconsideration, which the trial court also denied. Wen appealed, contending the trial court erred when, (1) it found Cai did not breach the settlement agreement, (2) it failed to hold an evidentiary hearing, and (3) it did not include findings of facts in its order. Cai requests attorney fees on appeal. Finding no error, we affirm.

FACTS

In February 2020, Daoying Cai and Xiangsong Hong, husband and wife, initiated a complaint against Boheng Wen and Shu Xie, husband and wife, for conversion, fraud, unjust enrichment, constructive trust, fraudulent conveyance, violation of the Consumer Protection Act, breach of contract, and negligence. In June 2022, the parties engaged in mediation with DeCosta Mediation and entered a CR 2A[1] settlement agreement. The agreement stipulated Wen was to pay Cai $650,000 "in full and final settlement of any and all claims asserted." To fund the payment, Wen's daughter, Qian Wen, agreed to quitclaim their home (the "first home") to Cai within 14 days.

---

[1] CR 2A provides, "No agreement or consent between parties or attorneys in respect to the proceedings in a cause, the purport of which is disputed, will be regarded by the court unless the same shall have been made and assented to in open court on the record, or entered in the minutes, or unless the evidence thereof shall be in writing and subscribed by the attorneys denying the same."

2

The agreement provided:

> 5.  As soon as reasonably possible after receipt of the referenced quit claim deed, [Cai] will prepare and list the property for sale in a time and at a sale price of their choosing and with a real estate agent of their choosing.
>
> 6.  [Cai] will use all efforts to obtain the maximum sale price for the Property.
>
> 7.  [Wen] will cooperate in all aspects of the sale and preparation for the sale process, including signing a limited power of attorney which authorizes plaintiffs to sign on behalf of [Qian][2] all documents necessary to effectuate the sale of the Property.
>
> . . .
>
> 14.  Provided all of the foregoing actions occur as required, [Cai] will make no disclosures about, and will keep confidential all aspects of this settlement, and the underlying dispute.
>
> . . .
>
> 16.  Plaintiffs will not engage in any further litigation regarding the claims herein unless there is a material breach. . . . In the event the defendants invoke recourse to cure, defendants shall be jointly and severally liable for liquidated damages of 5 [percent] of the amount that remains outstanding for each recourse to cure that is invoked.
>
> . . .
>
> 18.  If any dispute arises regarding the proper interpretation of the terms of this CR 2A agreement, the parties agree that [DeCosta Mediation] shall have sole authority to decide the same.

The agreement required Qian to sign a deed of trust in favor of Cai to secure the promise.  Additionally, Wen's son, Yuan Wen, was to sign a deed of trust to be recorded against his home (the "second home"), in the event the proceeds of the sale of the first home did not sufficiently fund the settlement amount.[3]

---

[2]  We use the first names of Wen's children to avoid confusion.

[3]  The second home was previously owned by Wen, but they quitclaimed the home to Yuan when they found out Cai was going to initiate a suit.

In August 2022, before listing the first home, Cai hired a property inspector to conduct an inspection of the home. The report noted repairs were needed for windows, cabinets, doors, electrical (observing safety hazards), bathtub, toilets, walls, sinks, dishwasher, stove, oven, and plumbing, among others. The report also stated the "serviceability of the roof is questionable" and recommend exterior paint.

Cai hired Windermere broker, Gene Cramer, to list the first home. Cramer noted the "home is sellable, but needs lots of attention to deferred maintenance items," including a new roof and, ideally, exterior and interior paint. He also recognized the home had an unusual design (seven bedrooms and minimal living spaces), and "would work for Multi-Generational Buyers, and possibly as a Boarding Rental House."

Cramer also conducted a price analysis. He looked at comparable properties in the area and determined the approximate market value was $1,037,800, but he concluded it should be listed under $1,000,000 to "get the most eyes on the property." On October 15, 2022, the home was listed online for $899,800. Cramer received an offer of $830,000 and countered at $849,000. This was the only offer received while the house was listed. Cramer and the potential buyers, Melissa and Christopher Teuton, agreed on a sale price of $840,000.

The Teuton's lender required an appraisal of the property, which was conducted on November 1, 2022, by Brown Precision Appraisal. The appraiser valued the first home at $840,000. In reaching this determination, the appraiser

reviewed three comparable properties and 20 comparable sales in the area. The comparable sales ranged from $750,000 to $1,100,000.

In addition to the comparable properties, the appraiser considered general market trends and specific features of the listing, including time on the market and the layout of the home. The appraiser noted that "current recession worries, inflation data, and fed/mortgage rate increases are noting an increasing impact on home values." Specific to the home, the appraiser stated that, while the home was on the market less than 30 days,[4] which "might indicate the potential for competitive offers at a slightly higher range, . . . the typical buyer group would have been reduced by the less typical room count of the subject property and the appraiser has taken this factor, as well as current market conditions, in the development of the current competitive market value opinion." The appraiser also noted that "almost 80 [percent] of the listed properties of similar homes in this more immediate market area sell in under [one] month on the market." Additionally, the property was double listed as a single-family residence as well as a multi-family residence, which the appraiser indicated was the agent "attempting to expand the appeal of the home to a broader market."

Yuan had not provided a deed of trust for the second home before the sale of the first home. In September 2022, Cai invoked the breach clause of the settlement agreement, giving Yuan 30 days to cure before a penalty applied. In

---

[4] The appraiser noted that for this property, a reasonable exposure time on the market was 30 days.

November 2022, Yuan had still not provided the deed, and Cai moved the court to enforce the CR 2A settlement agreement against Yuan.

In response to Cai's motion to enforce the settlement agreement, Yuan claimed Cai failed to use "all efforts" to obtain the maximum sale price for the first home, as the settlement agreement required. Yuan provided an unofficial[5] house price analysis and estimated the first home was worth $1,500,000. Yuan based this on comparable houses in the area. Yuan asked the court to find Cai had breached the settlement agreement and deny their motion. In Cramer's reply declaration, he noted that the "comparable" properties Yuan used to conduct the price analysis were outdated (some of the listings were more than a year old), located in nicer neighborhoods, better maintained, and newer than the first home. The court granted Cai's motion to enforce the CR 2A agreement and entered judgment against Yuan.

By late November 2022, the sale of the first home was still pending because Qian had not verified the power of attorney was irrevocable—a condition imposed by the title company handling insurance for the sale transaction. Qian had already signed a power of attorney granting Cai's counsel, T. Jeffrey Keane, the legal right to effectuate sale of the property, but the title company requested confirmation from Qian that the power of attorney was irrevocable and that any interest Jin Ping (Qian's husband) had in the property was extinguished. Because Qian refused to provide that assurance to the title company, Cai moved the court for summary judgment, requesting confirmation

---

[5] It appears that Wen performed the analysis themselves.

6

that Keane be "legally empowered to sign all remaining documents needed to effectuate sale of the property pledged by [Qian]."

In response to Cai's motion for summary judgment, Qian claimed an issue of material fact existed as to whether Keane acted in contravention of Qian's reasonable expectations concerning the sale price of the first home. Qian contended she had expressly stated she did not authorize Keane to proceed with the sale at the price of $840,000, therefore, if Keane continued with the sale, he would be breaching his fiduciary duties. Qian also contended Ping only signed a "limited" power of attorney, and the relief Cai sought—to confirm Ping's rights were extinguished—fell outside the scope of the document. The court granted Cai's motion, noting Qian and Ping executed a valid, limited power of attorney, under which Keane had the authority to execute the document required by the title company.

Despite the court's order, the title company refused to insure the transaction and the sale of the first home stalled. In February 2023, Cai again moved to enforce the CR 2A agreement and sought judgment against Wen and Qian. Neither party responded. The court entered judgment against Wen and Qian and granted Cai's motion to enforce the settlement agreement. In March 2023, Cai moved to appoint a commissioner to convey the property pledged by Qian and to execute a deed of trust against the second home. The court granted Cai's motion. The sale of the first home closed on May 18, 2023. Because of the underlying mortgage and cost of preparing the home for sale, the net proceeds did not cover the $650,000 agreed to in mediation.

7

In May 2025, Wen moved to enforce the settlement agreement and enjoin Cai from taking any action to "sell, foreclose upon, impose or transfer an interest in [the second home]."[6]  Wen contended Cai had breached the settlement agreement by not seeking the maximum price for the first home and for violating the confidentiality term of the agreement.  Wen stated the "conservative market value of the First Home at the time of the Listing Date was approximately $1,050,000, equaling $210,000 more than the Sale Price."  This estimate was based on a May 18, 2023, appraisal that Wen initiated.  ABS Valuation performed the appraisal and, in its report, noted its scope of work included:

- Reviewed and included residence description and photos prepared by Client
- Reviewed Wen CMA
- Reviewed 10/2004 Appraisal – Thomas Reed, SRA – appraised value $500,000
- Inspected the subject property from the street
- Reviewed historical information relating to 2023 market
- Reviewed NWMLS sales.
- Reviewed MetroScan sales and subject assessed values
- Reviewed the ABS Valuation database
- Spoke with the Listing Agent – Gene Cramer

The report indicated the purpose of the appraisal was to form an opinion of the value of the first home as of May 18, 2023.[7]  The appraisal evaluated five comparable sales with sale prices ranging from $750,000 to $1220,000.  ABS's

---

[6]  At the time the motion was filed, Cai had begun the foreclosure process on the second home.

[7]  This was about six months after Cramer accepted the Teuton's offer of $840,000.

8

comparisons and overall evaluation were considerably less detailed than Brown Precision Appraisal's report.[8]

Based on ABS's evaluation and the tax assessed value of the first home,[9] Wen contended Cai did not use all efforts to obtain the maximum sale price by accepting the first offer and only having the house listed for 21 days. Wen's other argument, concerning the breach of confidentiality, was premised on a January 2023 letter Wen received from Teuton—the purchaser of the first home. In that letter, sent before closing, Teuton sought Wen's cooperation with the sale of the home and stated, "I have learned that should our purchase of your home not be completed, the lawyer who is managing the sale, Mr. Keane, will begin the foreclosure process on the property." Wen alleged that Keane telling Teuton he was going to foreclose on the property was a breach of the confidentiality provision of the settlement agreement.

In response to Wen's motion to enforce the settlement agreement, Cai claimed judgment had already been entered and res judicata barred Wen's motion. The court denied Wen's motion, but did not indicate its reasoning (i.e., whether res judicata barred relitigating the issue). Wen moved for reconsideration, requesting the court grant their motion or, alternatively, clarify its reasoning for the denial. The court denied Wen's motion for reconsidering,

---

[8] In addition to location, year built, and size, Brown Precision Appraisal considered and adjusted for various features of the comparable properties, including the quality of construction, site improvements, gross living area, and layout of the home (e.g., number of kitchens, bedrooms, etc.). Conversely, ABS's appraisal only indicated location, year built, size, and noted remodels.

[9] On May 18, 2023, the tax assessed value was $1,082,000.

concluding: "The Court being fully advised, hereby FINDS that [Cai] did not breach Article 6 or Article 14, or any other provision of the Settlement agreements as outlined and argued in [Wen's] briefing." Wen appealed.

ANALYSIS

Breach of Settlement Agreement

Wen contends the trial court erred when it denied their motion to enforce the settlement agreement and motion for reconsideration and concluded Cai did not breach the settlement agreement. Cai does not address the alleged breach, but instead claims Wen's appeal is untimely, not properly before this court, and does not follow the rules of appellate procedure. Cai's arguments are without merit but, nonetheless, the trial court did not err when it denied Wen's motions.

When a party moves to enforce a settlement agreement and relies on "affidavits or declarations to show that a settlement agreement is not genuinely disputed," the court considers the motion as if it were a motion for summary judgment. *Brinkerhoff v. Campbell*, 99 Wn. App. 692, 696, 994 P.2d 911 (2000). Because we review a court's ruling on a motion for summary judgment de novo, we apply that same standard for motions to enforce a settlement agreement. *Condon v. Condon*, 177 Wn.2d 150, 162, 298 P.3d 86 (2013).

In a motion for summary judgment, the moving party "carries the burden of proving there is no genuine dispute as to the material terms or existence of the agreement." *Cruz v. Chavez*, 186 Wn. App. 913, 920, 347 P.3d 912 (2015). If the moving party meets that burden, the burden then shifts to the nonmoving party to produce evidence to show there is a genuine issue of material fact.

*Cruz*, 186 Wn. App. at 920. "The parties' submissions must be read in the light most favorable to the nonmoving party in order to determine whether reasonable minds could reach only one conclusion." *Condon*, 117 Wn.2d at 162. If a genuine issue of fact exists, "a trial court abuses its discretion if it enforces the agreement without first holding an evidentiary hearing to resolve the disputed issues of fact." *Brinkerhoff*, 99 Wn. App. at 697.

Principles of contract law govern settlement agreements. *Morris v. Maks*, 69 Wn. App. 865, 868, 850 P.2d 1357 (1993). The primary objective in contract interpretation is to "determine the intent of the parties based on the objective manifestations of the agreement." *Condon*, 117 Wn.2d at 162. Words in the agreement are given their plain, ordinary meaning, and "courts will not revise a clear and unambiguous agreement" or enforce terms that are not implied. *Condon*, 117 Wn.2d at 163.

1. <u>Cai's Allegations</u>

First, addressing Cai's contentions, Wen properly and timely appealed the court's orders. Cai alleges Wen never appealed any of the court's judgments, and to obtain any relief now, the proper channel would have been under CR 60. But Wen is not appealing the court's judgments, the appeal is of the court's denial of their motion to enforce the settlement agreement and motion to reconsider. Cai provides no argument why the motion to enforce the settlement agreement was untimely or inappropriate. Additionally, contrary to Cai's

11

contention that Wen's assignments of error "run afoul" of RAP 10.3,[10] Wen's

assignments of error clearly state each error they contend was made by the trial

court. Wen was not required to cite rules, statutes, or any other authority in the

issues section. For these reasons, Cai's allegations are meritless.

2. "All Efforts to Obtain Maximum Sale Price"

Wen claims the trial court erred when it found Cai did not breach article six

of the settlement agreement, which required Cai to "use all efforts to obtain the

maximum sale price for the Property." Wen points to ABS's appraisal of

$1,050,000 and the tax assessed value of the first home ($1,082,000) to assert

that the sale of the first home at $840,000 was significantly below the "maximum

sale price." Wen relies primarily on *Allard v. Pac. Nat'l Bank*, 99 Wn.2d 394, 663

P.2d 104 (1983), to support their contention, but that case is distinguishable.

In *Allard*, the court was presented with the question of whether a trustee

breached its fiduciary duties by failing to obtain the best possible price in the sale

of a property. 99 Wn.2d at 405. The court concluded a trustee breaches its

fiduciary duty if it does not "obtain[] an independent appraisal of the property" or

" 'test[] the market' to determine what a willing buyer would pay." *Id.* at 406

(quoting *Hatcher v. United States Nat'l Bank*, 56 Or. App. 643, 652, 643 P.2d 359

(1982)).

Here, both Cai and the lender conducted independent appraisals and

determined the value of the first home was $840,000. While this number differs

---

[10] RAP 10.3(a)(4) provides that an appellant's brief must contain "[a] separate concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error."

from the appraisal Wen conducted, which valued the home at $1,050,000, no genuine issue of material fact is disputed. In fact, the pricing analysis of Cai's broker, Cramer, indicated a similar approximate market value of the home as Wen's appraisal, $1,037,800, but concluded that based on the housing market, the uniqueness of the property, and the repairs needed on the home, a listing price "at, or just below, $900,000, would be most prudent." Wen's appraisal was conducted six months after the original offer was made and was much more limited in scope than Cai's or the lender's appraisal. Additionally, Wen provides no authority for their contention that a sale below estimated market value is per se a breach of fiduciary duty. *See Cox v. Helenius*, 103 Wn.2d 383, 389, 693 P.3d 683 (1985) ("The trustee of a deed of trust is not required to obtain the best possible price for the trust property.")

The settlement agreement did not define "all efforts," and Wen does not challenge the interpretation of the term; they claim only that Cai breached the terms of the agreement. But Cai conducted an independent appraisal of the first home, listed the property on the market as both a single-family and multi-family home, thereby broadening its reach, and considered recent market trends, which indicated "an increasing impact on home values." Wen has provided no evidence to support a claim that leaving the house on the market for longer, or any other action, would have resulted in a higher bid, or even a second bid. Accordingly, Cai provided evidence to support a finding that they did not breach the agreement and made all efforts to obtain the maximum sale price for the first

13

home.  The court did not err when it denied Wen's motion to enforce the settlement agreement and their motion for reconsideration.

    3.  <u>Confidentiality</u>

Wen contends Cai breached article 14 of the settlement agreement, which stated, "Provided all of the foregoing actions occur as required, [Cai] will make no disclosures about, and will keep confidential all aspects of this settlement, and the underlying dispute."  The only evidence Wen provides to support their claim is a letter from Teuton conveying they had "learned that should our purchase of your home not be completed, the lawyer who is managing the sale, Mr. Keane, will begin the foreclosure process on the property."

First, no indication from this statement shows that Cai breached the confidentiality provision of the settlement agreement, and Wen provides no argument otherwise.  That Keane was going to foreclose on the property if the sale did not go through does not implicate any provisions of the settlement agreement.  But, even if it did, the confidentiality provision applied only "[p]rovided all of the foregoing actions occur as required."  By the time Teuton sent this letter (January 19, 2023), the court had already entered judgment against Yuan and granted Cai's motion to enforce the settlement agreement because of Yuan's failure to sign a deed of trust to the second home—a requirement of the settlement agreement.  Because Wen had already failed to uphold their end of the agreement, the confidentiality provision no longer applied. For these reasons, we conclude Cai did not breach the confidentiality provision of the settlement agreement.

Evidentiary Hearing

Wen contends the trial court erred by not holding an evidentiary hearing because a dispute existed concerning the market value of the property. Cai contends Wen did not request an evidentiary hearing; therefore, they waived the right to appeal. Because no factual dispute existed, the court was not required to hold an evidentiary hearing.

We review a trial court's decision on whether to hold an evidentiary hearing for abuse of discretion. *Cruz*, 186 Wn. App. at 923. A trial court abuses its discretion when a genuine issue of material fact exists and the court enforces a settlement agreement without conducting an evidentiary hearing. *Cruz*, 186 Wn. App. at 916. A court's findings of fact are reviewed for substantial evidence. *In re Marriage of Porter*, 3 Wn.3d 579, 588, 555 P.3d 379 (2024). "Substantial evidence exists if a rational, fair-minded person would be convinced by it." *In re Est. of Palmer*, 145 Wn. App. 249, 265–66, 187 P.3d 758, 767 (2008).

Here, Wen was not required to request an evidentiary hearing, as Cai contends. The court would have been required to conduct an evidentiary hearing if a genuine issue of fact existed. Wen asserts the market value of real property and the issue of whether a party has complied in good faith with contractual obligations presents an issue of fact, thereby implicating the court's duty to conduct an evidentiary hearing. Wen is correct that both issues are factual,[11] but the existence of a factual issue itself does not warrant an evidentiary hearing—an

_____

[11] *See Porter*, 3 Wn.3d at 588 ("Property valuation is a question of fact and is reviewed for substantial evidence."); *Palmer*, 145 Wn. App. at 263 ("[G]ood faith is an issue of fact.")

evidentiary hearing is necessary only if a *genuine issue of material* fact is present. Here, substantial evidence supported the court's finding that Cai did not breach the settlement agreement or their duty to "use all efforts to obtain the maximum sale price for the [first home]." The overall appraisals were similar, and the realtor provided the court with information as to why the pricing of the home was appropriate. Because the court had enough evidence before it to support its ruling on summary judgment, it was not an abuse of discretion for the trial court to not hold an evidentiary hearing.

<u>Findings of Fact</u>

Wen claims the court erred when it did not state its findings of fact in its order denying Wen's motion to enforce the settlement agreement and motion for reconsideration. Under Rules of Pleading, Practice and Procedure, Rule 52, findings of fact and conclusions of law are not necessary on decisions of summary judgment. *See also Brinkerhoff*, 99 Wn. App. at 699 ("Because our standard of review is de novo . . . we do not defer to the trial court's evaluation of the record."); *Bricker v. State*, No. 42139-9-I, slip op. at 4 (Wash. Ct. App. Apr. 1, 2013) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2042139-9-II%20Unpublished%20Opinion.pdf (rejecting the argument that the trial court erred by failing to enter findings of fact when enforcing a settlement agreement).

Wen cites to *Schoonover v. Carpet World, Inc.*, 91 Wn.2d 173, 177, 588 P.2d 729 (1987), where the court held "a trial court must make ultimate findings of fact on material and pivotal issues." But that case involved a trial, not summary judgment. Here, the court was not required to enter findings of fact, but

16

in response to Wen's motion for reconsideration, where Wen requested the court to make findings, the court added to its order: "The Court being fully advised, hereby FINDS that the Plaintiff did not breach Article 6 or Article 14, or any other provision of the Settlement agreement as outline and argued in [Wen's] briefing." Because the trial court was not required to enter findings of fact, no error occurred.

Attorney Fees

Cai requests attorney fees on appeal, claiming (1) the trial court's order entitled them to fees for any ongoing litigation, (2) Wen's appeal violated CR 11, and (3) Wen's appeal was frivolous. Because no applicable law supports a recovery of attorney fees, we deny Cai's request for fees on appeal.

RAP 18.1 provides that applicable law may grant a party the right to recover reasonable attorney fees or expenses on review. Absent " 'a contract, statute, or recognized ground in equity[,]' " attorney fees are not available on appeal. *State v. Numrich*, 197 Wn.2d 1, 32, 480 P.3d 376 (2021) (internal quotation marks omitted) (quoting *LK Operating, LLC v. Collection Grp., LLC*, 181 Wn.2d 117, 123, 330 P.3d 190 (2014)). A party requesting fees under RAP 18.1 must provide argument and citation to authority "to advise the court of the appropriate grounds for an award of attorney fees as costs." *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (2012). RAP 18.9(a) allows the appellate court to order sanctions against a party who uses the court rules for purpose of delay or files a frivolous appeal. CR 11 sets the rules for signing and drafting a motion and states a court may impose sanctions if a motion is signed

17

in violation of said rules. CR 11 requires a motion to be "well grounded in fact" and "not interposed for any improper purpose, such as to harass or to cause unnecessary delay." CR 11(a)(1), (2). An appeal is frivolous where " 'no debatable issues upon which reasonable minds might differ, and it is so totally devoid of merit that there was no reasonable possibility' of success." *In re Recall of Feetham*, 149 Wn.2d 860, 72 P.3d 741 (2003) (internal quotation marks omitted) (quoting *Millers Cas. Ins. v. Briggs*, 100 Wn.2d 9, 15, 665 P.2d 887 (1983)).

Cai's request for attorney fees is not supported by applicable law and, despite ultimately being unsuccessful, Wen's motion to enforce the CR 2A agreement did not violate CR 11 and was not frivolous. Cai contends Wen's motion to enforce the settlement agreement was improper because Wen was required to seek further mediation from DeCosta Mediation before bringing their motion and subsequent appeal. But the CR 2A agreement required only that the parties return to mediation "[i]f any dispute arises regarding the proper interpretation of the terms" in the agreement. Here, the issue is not concerning the interpretation of terms of the agreement, the issue is whether Cai breached the terms of the agreement; therefore, further mediation was not required.

Additionally, the trial court's order indicating that Cai "may, in the future, submit a request for an award of all fees incurred by [Cai] during the process of seeking enforcement of the CR 2A agreement" does not constitute an order granting attorney fees on appeal, nor is it "applicable law" this court may rely on to award attorney fees. Furthermore, the CR 2A agreement provided that "[e]ach

18

party is responsible for their own attorney's fees and costs." Because Cai has not identified a basis for attorney fees grounded in contract, statute, or a recognized principle of equity, the request for fees is denied.

We affirm.

WE CONCUR: